U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 NOV -5 P 3:13

CLERK

BY DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:25-cr-00042-1 |
| FARLEEK HOPKINS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS TO SUPPRESS DIGITAL EVIDENCE AND STATEMENTS**
(Docs. 48, 49)

On April 17, 2025, Farleek Hopkins was charged in a single-count indictment with conspiring to distribute cocaine from in or about June of 2022 through November 12, 2023, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C), and 846. On February 20, 2026, Defendant moved to suppress certain digital evidence (Doc. 48) as well as statements he made to investigators on March 24, 2025 (Doc. 49.) The court held a hearing on the motions on October 6, 2026.

Defendant is represented by Kevin M. Henry, Esq. The government is represented by Assistant United States Attorneys Eugenia A. Cowles and Nathanael T. Burris.

**I. Findings of Fact.**

On November 12, 2023, at approximately 9:13 p.m., the Burlington Police Department ("BPD") received a call reporting a shooting at 4 Decatur Street in Burlington, Vermont. The government contends the individuals present at the scene included Defendant, Khalif Jones, Anthony Smith, Bienvenido Hernandez, Christian Concepcion, Estevan Alvarez, and Allissa Gilbert. An occupant of the apartment explained that "after [he] heard gunshots," he heard "numerous people fleeing the apartment[,]" which he described as a "stampede." (Doc. 48-3 at 2.)

Officers arrived at the scene and discovered two individuals with gunshot wounds. One was pronounced dead at the scene, while the other later died from his injuries. BPD's investigation uncovered evidence of cocaine and crack sales "such as scales with powder residue that tested positive for cocaine[]" and "bags with powder that would be considered consistent with illegal drugs such as fentanyl," but "no significant amount of illegal drug[s]" were found. *Id.* at 3.

A search of phone records identified Defendant, who resides in New York, as a potential suspect in the conspiracy and a witness to the shootings. Thereafter, in their double homicide and drug conspiracy investigation, law enforcement sought search warrants to review the electronic accounts of those present at 4 Decatur Street at or near the time of the shootings.

In connection with their investigation, State of Vermont law enforcement agents as well as federal agents obtained at least seven search warrants pertaining to Defendant's cell phone and digital accounts, seeking evidence related to the crimes of "[two] counts of [m]urder and [i]llegal [c]ocaine [s]ales[,]" (Doc. 48-3 at 1):

1) A November 16, 2023 search warrant for T-Mobile data between August 16, 2023 and November 16, 2023 (the "T-Mobile search warrant") (Doc. 48-2);

2) A November 16, 2023 search warrant for Google data relating to the two crimes under investigation between August 15, 2023 and November 16, 2023 (the "Google search warrant") (Doc. 48-4);

3) A November 16, 2023 search warrant for Apple iCloud data relating to the two crimes under investigation, which imposed no temporal restrictions (the "iCloud search warrant") (Doc. 48-5);

4) A December 22, 2023 search warrant for Meta data relating to the two crimes under investigation between August 1, 2023 and December 22, 2023 (the "Meta search warrant") Doc. 48-6);[1]

5) A December 22, 2023 search warrant for Snapchat data relating to the two crimes under investigation between August 1, 2023 and December 22, 2023 (the "Snapchat search warrant") (Doc. 48-8);

---

[1] Defendant contends in his motion to suppress that the Meta search warrant lacked a date range. The government correctly points out that it has one.

6) A December 22, 2023 search warrant for Verizon data between November 13, 2023 and December 22, 2023 (the "Verizon search warrant") (Doc. 48-9); and
7) A December 23, 2025 search warrant for iPhone data relating to the two crimes under investigation between June 2022 and November 15, 2023) (the "iPhone search warrant") (Doc. 43).

On March 24, 2025, United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Samuel Brown and BPD Detective Eric Kratochvil traveled from Vermont to New York to interview Defendant, who was in custody after turning himself in on an unrelated domestic violence arrest warrant. Special Agent Brown told Defendant that he and Detective Kratochvil were not arresting Defendant and read him his *Miranda* rights, informing him he could choose to answer only some questions or no questions. Although there was no evidence of a written waiver, Defendant told the investigators he was "of course" willing to speak with them. (Doc. 49-2 at 2:55-3:05.) Defendant indicated he wanted to know what was going on. He instructed Special Agent Brown and Detective Kratochvil to "go ahead" with their questioning. *Id.* at 3:15-3:20.

Defendant spoke with Special Agent Brown and Detective Kratochvil for approximately two-and-a-half hours and was permitted to take breaks lasting approximately fifteen minutes. The tone of the conversation was informal, and the two agents and Defendant discussed an array of subjects including the merits of various dog breeds, the music performed by one of the shooting victims, and the deficits and virtues of Instagram. Defendant did not answer certain questions, although he answered others. In general, he sought to postpone the interview regarding the shootings to another time and another location, while the agents tried to convince him to speak to them during the interview because they had traveled to his location for that purpose. Defendant rebuffed their requests, although he repeatedly assured them he eventually planned to speak to them.

There is no evidence that the law enforcement officers physically touched or restrained Defendant. They made no threats and did not display their firearms. It is

unclear whether Defendant was handcuffed at the time of the interview.[2] There is no information regarding where the interview took place other than in an interview room at a police station.

Defendant was thirty-three years old at the time of the interview. His criminal history included convictions for criminal possession of a controlled substance with intent to sell, criminal possession of a weapon, attempted robbery, assault, and criminal sale of a controlled substance. He had also faced additional charges of assault, drug possession, giving false information to police, and criminal contempt. He told investigators that he had previously served time in a correctional facility.

There is no evidence that the investigators engaged in deceit or trickery. There is no evidence that Defendant was under the influence of alcohol or controlled substances at the time of the interview. There is no indication that he was sleep-deprived or lacked access to food or water.

## II. Conclusions of Law and Analysis.

Defendant seeks to suppress evidence obtained directly or indirectly from searches of his electronic devices and accounts, arguing that the search warrants violated the Fourth Amendment to the United States Constitution because they lacked particularity.[3]

Defendant also seeks to suppress any statements made to Special Agent Brown and Detective Kratochvil on the grounds that his waiver of rights under *Miranda v. Arizona*, 384 U.S 436, 479 (1966), was not knowing because this "was not an interview in which [he] knowingly waived his rights and then proceeded to speak freely with [the]

---

[2] The agents joked that although they had handcuffs, they had no authority to use them outside the state of Vermont.

[3] Defendant seeks suppression of any evidence obtained pursuant to undisclosed search warrants. The government responds that it "has satisfied and will continue to satisfy its [Fed. R. Crim. P.] 16 obligations[,]" which are "on-going[,]" and states that it will not object to the filing of further motions should evidence be obtained through additional search warrants. (Doc. 58 at 2 n.1). As the government has not indicated an intent to use evidence obtained from search warrants beyond those disclosed to the defense, Defendant's request is premature.

officers." (Doc. 49 at 2). He further claims that his statements were not made voluntarily, as required by the Fifth Amendment to the United States Constitution.

### A. Whether the Digital Evidence Should Be Suppressed.

The Fourth Amendment to the United States Constitution provides that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

In order for a search warrant to be sufficiently particularized, it must (1) "identify the specific offense for which the police have established probable cause[,]" (2) "describe the place to be searched[,]" and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Tompkins*, 118 F.4th 280, 287 (2d Cir. 2024) (citation and internal quotation marks omitted).

Law enforcement had probable cause to seek search warrants for Defendant's electronic accounts in light of his suspected presence at the double homicide which appeared to have arisen out of a drug trafficking dispute. The affidavits supporting the search warrants provided the basis for probable cause, including "communications between [Alvarez, Gilbert, and Defendant] which demonstrate that Alvarez and Smith recently sold illegal drugs for [Defendant]." (Doc. 48-3 at 17.) Surveillance revealed evidence that the shooters were short in height and had parked at or near Decatur Street in a manner that would allow a quick getaway. A witness described one of the shooters in a manner consistent with Defendant's appearance. Defendant allegedly stopped using his cell phone the day after the shootings, which law enforcement contended was an attempt to evade detection.

#### 1. Whether the T-Mobile and Verizon Search Warrants Are Invalid.

Both the T-Mobile search warrant, (Doc. 48-2), and the Verizon search warrant, (Doc. 48-9), fail to specify the crimes under investigation. Although this information is contained in the supporting affidavits, it was omitted from the search warrant itself,

which seeks not only information about cell phone, cell tower, and call data but also the "content" of Defendant's messages and applications. (Doc. 48-2 at 4; Doc. 48-9 at 2.)

It is settled law in the Second Circuit that failure to identify the suspected crimes for which evidence is sought renders a search warrant insufficiently particularized. *See In re 650 Fifth Avenue and Related Properties*, 830 F.3d 66, 99 (2d Cir. 2016) ("[F]or a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought[]") (citations omitted); *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("Nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken[,] . . . [which] offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary.") (citations omitted); *see also United States v. Wey*, 256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017) ("[O]n their face, both [w]arrants fail to set forth the crimes under investigation. . . . [F]ailure to reference the suspected crimes would alone be enough to render the [w]arrants insufficiently particularized.") (citation omitted).

The Fourth Amendment's particularity requirements must be satisfied "in the warrant, not in the supporting documents[,]" although "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *see also George*, 975 F.2d at 76 ("A sufficiently specific affidavit will not itself cure an overbroad warrant. . . . Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it."). Here, the search warrants do not incorporate the affidavits by reference. Their recitations that "[t]his warrant is issued upon the basis of an affidavit and finding of probable cause[,]" (Doc. 48-2 at 4; Doc. 48-9 at 2), "does not direct the executing officers to refer to the affidavit for guidance concerning the scope of the search and hence does not amount to incorporation by reference." *George*, 975 F.2d at 76 (finding insufficient "[t]he recitation

in the instant warrant that it is 'issued upon the basis of an application and affidavit[] of'" a law enforcement officer) (second alteration in original).

In *George*, a "catch-all" phrase in the contested search warrant that authorized law enforcement to search for "any other evidence relating to the commission of a crime[,]" rendered the warrant a prohibited "general warrant." *Id.* at 75. Although the T-Mobile and Verizon search warrants do not contain language of such breadth, they do authorize searches for open-ended categories of materials. The T-Mobile search warrant directs law enforcement to search for "[a]ll text message and/or MMS messages, including message content . . ." as well as "Cloud Data." (Doc. 48-2 at 1-2.) The Verizon search warrant, similarly, commands a search of "[i]ncoming and outgoing SMS and MMS[] 'text messages' and their content" and "[a]ny and all application data transfers and their content if available[.]" (Doc. 48-9 at 2.)

The breadth of the challenged search warrants, "while concerning under any circumstances, is only exacerbated by the fact that the [w]arrants target, in significant measure, the contents of electronic devices, such as computers, internal and external hard drives, and smartphones." *Wey*, 256 F. Supp. 3d at 386. "A general search of electronic data is an especially potent threat to privacy[.]" *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017). Moreover, "[b]ecause of the nature of digital storage, it is not always feasible to extract and segregate responsive data from non-responsive data . . . creating a serious risk that every warrant for electronic information will become, in effect, a general warrant[.]" *Id.* (citations and internal quotation marks omitted); *see also United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009) ("If the warrant is read to allow a search of all computer records without description or limitation it would not meet the Fourth amendment's particularity requirement.").

Because the T-Mobile and Verizon search warrants fail to specify the crime or crimes under investigation for which evidence is sought, and because there are no other "meaningful parameters on an otherwise limitless search" of Defendant's electronic data, they are facially deficient. *Ulbricht*, 858 F.3d at 100 (citations and internal quotation

marks omitted). Evidence obtained pursuant to these warrants will therefore be suppressed unless the good faith exception applies.

**2. Whether the Good Faith Exception Applies to the T-Mobile and Verizon Warrants.**

"Not every violation of the Fourth Amendment justifies invocation of the exclusionary rule to require suppression of evidence." *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020). When an officer "acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," suppression is not justified, even if the warrant is later invalidated. *United States v. Leon*, 468 U.S. 897, 920 (1984).

The good faith exception does not apply, however, when a search warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923. Moreover, "[i]t is well settled that evidence obtained from a deficient warrant executed in bad faith is suppressible." *United States v. Waker*, 534 F.3d 168, 173 (2d Cir. 2008). Suppression is therefore appropriate if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468 U.S. at 926.

"The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. Bershchansky*, 788 F.3d 102, 113 (2d Cir. 2015) (internal quotation marks omitted) (quoting *George,* 975 F.2d at 77). "In assessing whether [the government] has carried that burden, [the court is] mindful that, in *Leon,* the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011).

The Second Circuit in *George* determined that the good faith exception did not apply where the search warrant authorized open-ended searches for evidence without regard to a specific crime because it was "the type of facially invalid warrant that could not have been relied upon in good faith because one who simply looked at the warrant[] .

. . would . . . suspect it was invalid." 975 F.2d at 78 (alterations in original) (citation and internal quotation marks omitted). Eighteen years later, in *United States v. Rosa,* 626 F.3d 56, 64 (2d Cir. 2010), the Second Circuit determined that the application and affidavit in support of a contested search warrant, which specified the crimes to be investigated (although the search warrant itself did not), demonstrated that the investigating officer understood the warrant was limited to "a particular crime[.]" *Id.* at 65 n.3. The Second Circuit observed that although courts "may no longer rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to our determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case." *Id.* at 64. As a result,

> [c]ourts have often found that the good faith exception will save a defective warrant that fails to specify the crime for which probable cause was established where the executing officers nevertheless conducted the search pursuant to the warrant in accordance with the appropriate limitations set forth in the unincorporated and unattached supporting application or affidavit.

*United States v. Gilbert*, 2023 WL 4850552, at *13 (D. Conn. July 28, 2023) (citations and internal quotation marks omitted).

In *Rosa*, the Second Circuit analyzed several factors in determining whether the good faith exception applies. First, the "circumstances surrounding the investigation and application for a warrant, conducted with necessary speed in the early hours of the morning,"[4] weighed against a finding of bad faith. 626 F.3d at 66. Second, the search warrant had been executed by the author of the affidavit in support of the application, "demonstrat[ing] that the officers proceeded as though the limitations contemplated by the supporting documents were present in the warrant itself[.]" *Id.* Third, there was "no

---

[4] "[T]he application documents were drafted, the warrant was issued, and the search of Rosa's residence was executed pursuant to a judicially authorized warrant in the three hours from 2:00 a.m. to 5:00 a.m." on September 27, 2007, hours after police began investigating the alleged child pornography crime, the evidence of which could have easily been destroyed. *United States v. Rosa*, 626 F.3d 56, 64-65 (2d Cir. 2010).

evidence . . . [the] officers actually relied on the defective warrant, as opposed to their knowledge of the investigation and the contemplated limits of the town justice's authorization, in executing the search." *Id.* Finally, the Second Circuit found "no evidence that the team of officers searched for, or seized, any items that were unrelated to the crimes for which probable cause had been shown[.]" *Id.* at 65.

Applying *Rosa* to the case at bar, the court first analyzes the "circumstances surrounding the investigation and application for a warrant," including any exigencies forcing law enforcement to act hastily. 626 F.3d at 66. In this case, the double homicide took place on November 12, 2023. The T-Mobile search warrant was sought on November 16, 2023, four days later, and was issued the same day at 2:35 p.m. by Vermont Superior Court Judge A. Gregory Rainville. The iCloud and Google search warrants, each of which authorized searches for evidence of two counts of murder and illegal sales of cocaine, were issued on the same day as the T-Mobile search warrant. The iCloud search warrant was signed at 2:30 p.m., while the Google search warrant was signed at 2:29 p.m. Although the T-Mobile search warrant instructs law enforcement to execute the search within ten days, the record does not reveal when the search actually took place.

The Verizon search warrant was sought on December 22, 2023 and issued the same day at 6:50 p.m. by Vermont Superior Court Judge Michael J. Harris. According to the "Search Warrant Inventory/Return[,]" signed by Detective Kratochvil, the search warrant was served on Verizon by unnamed "Officers" on December 26, 2023, four days after its issuance. (Doc. 48-9 at 1.)

The facts in this case do not reflect the exigencies at issue in *Rosa*, where the warrant was sought, obtained, and executed all "in the early hours of the morning" immediately after the alleged crime was discovered. 626 F.3d at 66. To the contrary, in this case, there was ample time to carefully prepare and review the search warrants in question. This weighs in favor of suppression. *See Wey*, 256 F. Supp. 3d at 398 ("[T]he record reflects no evidence that the agents' failure to recognize these infirmities may be attributed to exigent or otherwise unusual circumstances that existed when the [a]ffidavits

or the [w]arrants were drafted or the [s]earches conducted."); *see also Groh,* 540 U.S. at 565 n.9 (observing affiant had not demonstrated "any sort of exigency existed when he drafted the affidavit, the warrant application, and the warrant, or when he conducted the search. This is not the situation, therefore, in which we have recognized that officers in the dangerous and difficult process of making arrests and executing search warrants" are afforded "some latitude.") (internal quotation marks omitted) (quoting *Maryland v. Garrison,* 480 U.S. 79, 87 (1987)).

The record and parties' briefings do not contain sufficient information to analyze the remaining *Rosa* factors. They do not address whether the affiant conducted the searches, whether the executing officers relied upon the defective search warrants rather than their own knowledge of the investigation and its contemplated limits, or whether the fruits of the search warrants reflect limitations on the search. In his affidavit in support of the Verizon search warrant, Detective Kratochvil alluded to "[a] brief review of [Defendant's] T-Mobile [Call Detail Records,]" (Doc. 48-7 at 27), and provided a short summary of its results, but he did not reveal who conducted this review, how it was conducted, and any subject matter constraints or other limitations imposed upon it.

Similarly, in the "[Verizon] Search Warrant Inventory/Return[,]" Detective Kratochvil wrote that "Officers served the search warrant on Verizon" and the "requested information [was] pending receipt." (Doc. 48-9 at 1.) The government has provided no indication whether the information received was confined to evidence of the two crimes under investigation. The court thus cannot find that the search was conducted in good faith.

Because the government has failed to carry its burden of "demonstrat[ing] the objective reasonableness of the officers' good faith reliance" on the facially deficient search warrants, *Bershchansky*, 788 F.3d at 113 (internal quotation marks omitted) (quoting *George,* 975 F.2d at 77), Defendant's motion to suppress is GRANTED with respect to the evidence seized pursuant to the T-Mobile and Verizon search warrants.

**3. Whether the iCloud and iPhone Search Warrants Are Invalid.**

Defendant seeks suppression of evidence seized pursuant to the iCloud and iPhone search warrants because the iCloud search warrant lacked temporal limitations and because the iPhone search warrant relied in part upon information obtained from the iCloud search warrant. *See* Doc. 39-3 at 3 ("[A]n examination of a[] [Defendant]-owned iCloud account shows him participating in suspected narcotics trafficking . . . . Contents of this iCloud account, including messages exchanged, suggest [Defendant] was using an iPhone backed up to his iCloud account."). The suppression of evidence seized pursuant to the iPhone search warrant may therefore depend on the validity of the iCloud search warrant. *See, e.g., United States v. Williams*, 365 F. Supp. 3d 343, 350 (S.D.N.Y. 2019) (observing that where search warrant application was "based almost entirely" on information obtained during unlawful search, "all evidence seized pursuant to the resulting search warrant must be suppressed as fruit of the poisonous tree.") (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

The government responds that a temporal limitation is not strictly required under Second Circuit precedent and that information in the iCloud search warrant and supporting documents regarding the specific crimes under investigation sufficiently limited the evidence that could be obtained. In the absence of controlling precedent, the government argues that *Leon*'s good faith exception applies.

"[A] temporal limitation is *one indicia* of particularity" for a search warrant under the Fourth Amendment. *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) (emphasis in original) (citation and internal quotation marks omitted). Nonetheless, it is equally well-established that "[a] failure to indicate a time frame could render a warrant constitutionally overbroad because it could allow the seizure of records dating back arbitrarily far and untethered to the scope of the affidavit which ostensibly provided probable cause." *United States v. Merino-Lopez*, 2026 WL 914966, at *8 (D. Vt. Apr. 3, 2026) (internal quotation marks omitted) (quoting *United States v. Hernandez*, 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010)). This is especially true of electronic search

warrants that could authorize the search of wholly unrelated items. As the defendant in *Rosa* argued:

> For example, officers conducting a search pursuant to the explicit terms of the warrant might review expense reports, income-related files and correspondence, and federal filing information in search of evidence of tax evasion. Or officers might read through e-mail correspondence in search of evidence of an internet-based phishing scheme. As a consequence, Rosa effectively argues that the warrant's authorization of an uncircumscribed search of his electronic equipment violated the Fourth Amendment's core protection against general searches because it provided the government with unrestrained access to electronic records of his daily activities and private affairs.

626 F.3d at 61.

Because of concerns like those identified in *Rosa*, courts examine the lack of a temporal limitation on a case-by-case basis. "The complexity and duration of the alleged criminal activities" may "render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates." *Hernandez*, 2010 WL 26544, at *11. Drug trafficking schemes may have unclear dates of commencement, duration, and termination, rendering it difficult to impose temporal limitations on a search. *Cf. United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996) (noting that narcotics conspiracies "are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness.") (internal quotation marks omitted) (quoting *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990)). Other crimes, in contrast, may themselves limit the time frame involved.

In this case, the alleged homicides took place on a discrete date, and the government does not assert that these crimes were of such a "complexity and duration" as to "render a time frame less significant[.]" *Hernandez*, 2010 WL 26544, at *11*; see also* *United States v. Reed*, 186 F.4th 1200, 1205 (10th Cir. 2026) ("When a crime occurs at a discrete time, the absence of a temporal limitation may render a search warrant overly broad.") (citation omitted). Correspondingly, however, the fact that the alleged homicides took place on a single identifiable date itself imposes a degree of particularity upon the

search warrant because only evidence related to the events on that date could be lawfully seized.

The iCloud search warrant was supported by an affidavit, which asserted there was probable cause due to the "evidence that Alvarez and Smith were selling drugs for Jones and then apparently started selling drugs for [Defendant]." (Doc. 48-3 at 18). The search warrant commanded law enforcement to "search for evidence of the crimes of 2 counts of Murder and Illegal Sales of Cocaine[.]" (Doc. 48-5 at 2.) The attachment to the search warrant imposed limitations on the "[p]articular [t]hings to be [s]eized[,]" including a list of "[s]ubscriber information," "[d]evice [i]nformation," and other "content of the above user's iCloud Account." *Id.* at 4. Although the illegal sales of cocaine do not themselves impose a temporal limitation, courts have generally not required strict temporal limitations for drug trafficking activities, and here the drug trafficking was limited to a single type of drug sale described in the supporting affidavit. *See, e.g.*, *United States v. Pugh*, 2015 WL 9450598, at *21 (E.D.N.Y. Dec. 21, 2015) (holding that a search warrant was not overly broad when it was limited to the fruits, evidence, and instrumentalities of the crime alleged and finding that "[t]he combination of the illustrative list in Attachment B and the focus on a specific crime properly limited the warrant to the probable cause adduced in the warrant affidavit[]"); *Merino-Lopez*, 2026 WL 914966, at *9 (rejecting defendant's challenge to a search warrant based on the lack of a temporal limitation because the search warrant "was generally limited to the contraband, fruits, instrumentalities, and evidence of the identified crimes[]" and because "[t]here was no need for an explicit time limit as the subject matter limitations on seizure effectively limited the time frame concerned[]") (internal quotation marks omitted) (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306 (S.D.N.Y 2018)).

Even without the iCloud data, materials submitted in support of the iPhone search warrant on December 23, 2025 contained sufficient evidence to establish probable cause. The affidavit in support of the criminal complaint against Defendant, drafted by Special Agent Brown on April 8, 2025 and attached to the iPhone search warrant application, contained evidence of Defendant's alleged drug trafficking activities. This included

information from a witness to the shooting who told investigators that they "had sold cocaine and crack cocaine on behalf of [Defendant] and others associated with [Defendant]." (Doc. 39-4 at 4-5). The affidavit also provided information from interviews with other individuals regarding Defendant's alleged drug distribution activities, including one individual who said they had "bought ounces or more [of drugs] from [Defendant] approximately twelve times but bought smaller amounts from him over a hundred times." *Id.* at 6.

The iPhone search warrant application materials additionally provided evidence that Defendant had been present at or involved in the alleged homicides. The affidavit in support of the criminal complaint contained information from one shooting victim's phone showing that the victim exchanged text messages with Defendant starting at 4:47 p.m. on the day of the homicides. The victim wrote to Defendant, "I'm a man at the end of the day I won't run from anyone if that's the situation. . . . I'm texting this because if I was in your shoes everyone would be suspect.[ ]I don't think you'd do anything to me[.]" *Id.* at 26. The affidavit stated further that at 5:36 p.m., Defendant instructed the victim to call him, and the two spoke on the phone for one minute and forty-three seconds. The affidavit in support of the iPhone search warrant, drafted by Special Agent Brown on December 23, 2025, stated that the iPhone was found at the scene of the shooting and that Defendant had sent a message on Instagram ten days following the shooting that he had "lost [his] phone." (Doc. 39-3 at 3.) It also related that a cooperating witness informed Special Agent Brown that Defendant had told her he had left his phone inside the house at 4 Decatur Street. There was therefore sufficient evidence in the iPhone search warrant application materials to satisfy the Fourth Amendment's probable cause requirement with respect to both crimes under investigation even without the evidence derived from the iCloud search warrant.

Albeit a close call, the iCloud search warrant is not so lacking in particularity as to constitute a general warrant. Law enforcement remained constrained in terms of what items could be searched and seized. In turn, the iPhone search warrant based on evidence

obtained from the iCloud search warrant is not tainted as the "fruit of the poisonous tree." *Wong Sun*, 371 U.S. at 488.

For the foregoing reasons, Defendant's motion to suppress digital evidence obtained from the iCloud and iPhone search warrants is DENIED.

**4. Whether the Good Faith Exception Applies to the iCloud and iPhone Warrants.**

For appellate review, the court considers the government's assertion that even if the court were to find the iPhone search warrant unconstitutional, the good faith exception in *United States v. Leon* would apply. The court agrees.

There is no Second Circuit precedent requiring a temporal limitation for cell phone or cloud evidence. Nor does Defendant cite any authority from any other Circuit to this effect. The omission of a temporal limitation on the iCloud search warrant therefore does not render it "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

The government, arguing that law enforcement officers acted in good faith, points to a report written by an ATF agent showing that responsive information from the iCloud search warrant included messages from only a one-year period leading up to the November 12, 2023 homicides. Although evidence obtained from a search warrant cannot retroactively satisfy the particularity requirement, *see Garrison*, 480 U.S. at 85 ("Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued[]"), it can shed light on whether agents respected the "contemplated limits" of the search or seized evidence "unrelated to the crimes for which probable cause had been shown[.]" *Rosa*, 626 F.3d at 65. The limited scope of the responsive materials obtained by virtue of the iCloud search warrant supports the conclusion that the warrant was not executed in bad faith.

For the reasons stated above, assuming *arguendo* that the iCloud search warrant was insufficiently particularized, Defendant's motion to suppress evidence from the iCloud search warrant and the iPhone search warrant would be denied under *Leon*'s good faith exception.

#### 5. Whether the Evidence from the Remaining Warrants Should Be Suppressed.

Defendant seeks suppression of any evidence that "exceeded the judicially authorized scope of [the] warrants, such as evidence that falls outside of the permissible dates to search[.]" (Doc. 48 at 8.) Every search warrant other than the iCloud search warrant contained explicit date ranges. The government represents that it will not seek to admit evidence beyond the temporal bounds of those search warrants. No other aspect of this group of search warrants has been challenged. Defendant's motion to suppress evidence from the Google, Meta, and Snapchat search warrants is therefore DENIED AS MOOT. *See United States v. Duran-Colon*, 252 F. App'x. 420, 422 (2d Cir. 2007) (summary order) ("The [defendant's] motion became moot as it related to [defendant's] statements when the government determined not to offer them."); *see also United States v. Guo*, 2024 WL 1862022, at *4 (S.D.N.Y. Apr. 29, 2024) ("Because the [g]overnment does not intend to offer such evidence, . . . the motion is DENIED as moot.") (emphasis in original).

For the foregoing reasons, the court GRANTS Defendant's motion to suppress with respect to digital evidence seized pursuant to the T-Mobile and Verizon search warrants and DENIES the motion with respect to all other search warrants.

### B. Whether Defendant's Statements Should Be Suppressed.

"No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. The Supreme Court in *Miranda v. Arizona* ruled that law enforcement may not, consistent with the Fifth Amendment, interrogate a suspect who has been taken into custody without warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S at 479.

### 1. Whether Defendant's *Miranda* Waiver Was Valid.

"For a *Miranda* warning to be required, the defendant must be subject to an interrogation, and the interrogation must have occurred while the defendant was in custody." *United States v. Pence*, 172 F.4th 213, 217 (2d Cir. 2026) (citations omitted). "An interrogation occurs when a suspect 'is subjected to either express questioning or its functional equivalent' and his statements are 'the product of words or actions on the part of the police' that 'were reasonably likely to elicit an incriminating response.'" *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The government does not dispute law enforcement's interview with Defendant constituted custodial interrogation subject to *Miranda*. Defendant, in turn, concedes Special Agent Brown and Detective Kratochvil read him his *Miranda* rights and that he agreed to speak with them. He disagrees, however, that the interview, in which he refused to answer certain questions, was one "in which [he] knowingly waived his rights and then proceeded to speak freely with officers." (Doc. 49 at 2.)

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alteration in original) (internal quotation marks omitted). "Such a waiver . . . must be knowing[] in the sense that it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (second alteration in original) (emphasis and internal quotation marks omitted). "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam)).

Defendant was thirty-three years old at the time of the interview. He had an extensive criminal history and told interviewers that he had been in jail before. His background and experience thus indicate that he understood his *Miranda* rights and

agreed to waive them. *See, e.g., United States v. Whyte*, 2023 WL 8096926, at *8 (E.D.N.Y. Nov. 21, 2023) (observing "[defendant] has an extensive criminal background, which suggests that he is familiar with criminal procedure and his rights"); *United States v. Gonzalez*, 2011 WL 5994791, at *6 (S.D.N.Y., Nov. 30, 2011) ("[The defendant] was very familiar with his *Miranda* rights, and the consequences of waiving those rights, as a result of his lengthy criminal record.").

There is also no evidence to indicate that Defendant was under any physical or emotional duress or coercion at the time of the interview. To the contrary, his tone of voice was calm and deliberate, and at times jocular, and he told the law enforcement officers he wanted to talk to them. *See United States v. Lettieri*, 2023 WL 3741480, at *7 (W.D.N.Y. Feb. 27, 2023) ("Here, defendant voluntarily waived his rights and expressed willingness to talk to [law enforcement agents]."). Nothing about the setting, length, or circumstances of the interview supports a finding of a coercive waiver.

Based on the totality of the circumstances, the court finds that Defendant's waiver of his *Miranda* rights was valid.

### 2. Whether Defendant's Statements Were Voluntary.

"The existence of a knowing and voluntary waiver does not . . . guarantee that all subsequent statements were voluntarily made[,]" *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (quoting *In re Terrorist Bombings*, 552 F.3d 177, 211-12 (2d Cir. 2008)), which is required by the Fifth Amendment's Due Process Clause. "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession[.]" *Lego v. Twomey*, 404 U.S. 477, 483 (1972). "The government bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary." *United States v. Roncone*, 824 F. Supp. 3d 311, 323 (W.D.N.Y. 2026) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)). The Supreme Court has observed that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered

to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (alteration adopted) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)).

To determine if Defendant's statements were voluntary notwithstanding his *Miranda* waiver, the court must again "examine the totality of the circumstances. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *In re Terrorist Bombings*, 552 F.3d at 213 (internal quotation marks omitted) (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)); *see also United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) ("Relevant factors include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, [] any use of physical punishment[, and] [a] defendant's mental vulnerability[.]") (alteration adopted) (internal quotation marks and citations omitted)).

Before excluding a statement on voluntariness grounds, the court must make "specific findings" that "the defendant's will was overborne by the police conduct." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (alteration, citations, and internal quotation marks omitted). The "crucial element[,]" therefore, is "police overreaching." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (footnote omitted). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164 (footnote omitted).

To the extent Defendant claims his statements were not voluntary and therefore coerced, he cites scant evidence in support of that contention. As the government points out, throughout the relatively brief interview, Defendant repeatedly refused to answer questions about the shootings, while answering other questions. This is evidence that "at no point was [Defendant's] will overborne." (Doc. 57 at 4); *see also United States v. Martin*, 2022 WL 3211411, at *6 (D. Vt. Aug. 9, 2022) (concluding defendant's statements were voluntary in part because he "repeatedly and vehemently denied" the allegations against him).

Defendant does not assert that he had any mental limitations or vulnerabilities that made him unusually susceptible to having his will overborne. His prior interactions with law enforcement and time in a correctional facility demonstrate that he was no "newcomer to the law[.]" *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (citing *United States v. Watson*, 423 U.S. 411, 424-25 (1976)); *see also United States v. Mitchell*, 2025 WL 2355679, at *4 (N.D.N.Y. May 7, 2025) (finding defendant with seven prior arrests and a felony conviction was not "'a newcomer to the law[]'") (quoting *United States v. Hall*, 724 F.2d 1055, 1059 (2d Cir. 1983)).

The interview took place in a room in a police precinct. Only two officers were present, dressed in plain clothes, and there is no evidence that the agents were visibly armed or that Defendant was handcuffed or otherwise restrained. *See Haak*, 884 F.3d at 415 (concluding defendant's will was not overborne and noting that he "met with police in a standard interview room. . . . Two officers were present for the interview, both dressed in casual plain clothes and neither displaying any weapons. [Defendant] himself was unrestrained throughout the interview.").

The interview lasted two hours and forty-five minutes, including breaks. This length of time was not inherently coercive. *See, e.g.*, *Berghuis*, 560 U.S. at 386-87 ("It is true that apparently [defendant] was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive."); *Saunders v. Lavalley*, 2014 WL 2624763, at *16 (S.D.N.Y. June 10, 2014) (collecting cases holding that interrogations lasting from two to three hours were not inherently coercive).

The conduct of law enforcement likewise indicates that Defendant's statements were voluntary. There are no allegations of misconduct or the use of physical violence or physical or verbal coercion. The investigators' tone was generally conversational, non-accusatory, and, at times, jovial. They did not raise their voices or otherwise threaten Defendant. They permitted Defendant to ask them questions and generally honored Defendant's decision to control the subject matter of the interview. They informed Defendant at the beginning of the interview that "if you are willing to talk, you can

answer some questions, you can answer no questions, [or] somewhere in between." (Doc. 49-2 at 2:36-46.)

Defendant persisted in advising law enforcement that he would be willing to discuss the shootings at a later date and in a different location but he was unwilling to do so in the interview. In response, Special Agent Brown and Detective Kratochvil occasionally prodded Defendant and urged him to speak, saying "we don't want to hear, 'let's talk later'" and "there's no time like the present," and informed him that the interview was his "opportunity to talk to us. Not tomorrow, today." *Id.* at 12:15-20, 18:20-25, 1:49:43-47. "The Second Circuit has repeatedly held that encouraging a suspect to cooperate does not render a confession involuntary or statements inadmissible." *United States v. Figaro*, 568 F. Supp. 3d 459, 467 (S.D.N.Y. 2021) (citing *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989), *cert. denied*, 493 U.S. 1082 (1990); *United States v. Alvarado*, 882 F.2d 645, 649-50 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974), *cert. denied*, 419 U.S. 1032 (1974)). "There is no inconsistency between the required warning that the defendant's statement may be used against him and a further statement that cooperation can help him. Both are true." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995); *see also United States v. Molodtsova*, 2010 WL 723688, at *7 (D. Vt. Feb. 25, 2010) ("Voluntariness means the absence of police coercion or overreaching. . . . It does not constitute coercion or overreaching, however, for police to remind a suspect that cooperation can help [him].").

Defendant argues that he was "surprised when he was confronted by law enforcement who began questioning him about events in Vermont." (Doc. 49 at 2.) Special Agent Brown and Detective Kratochvil disclosed their arrival from Vermont at the outset of the interview and described the purpose of the interview as well. "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 577 (1987); *see also United States v. Burger*, 728 F.2d 140, 141 (2d Cir. 1984) ("[T]here

is no *Miranda* requirement that law enforcement officers must inform a suspect of the crime they are investigating. . . . When the questioning points in the direction of illegal conduct, the person being interrogated may, as [the defendant] did, refuse to answer.") (citations omitted). Interviewing Defendant regarding his conduct in Vermont was therefore neither deceptive nor coercive.

Based on the totality of the circumstances, nothing about law enforcement's interview with Defendant supports a conclusion that the statements he provided were not voluntarily and knowingly made. For that reason, his motion to suppress those statements is DENIED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendant's motions to suppress. (Docs. 48, 49.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 5th day of November, 2026.

Christina Reiss, Chief Judge
United States District Court